**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Arnold REDD; Bernard Shackleford,**
**Defendants–Appellants.**

No. 99–2093, 99–2095.

United States Court of Appeals,
Sixth Circuit.

Feb. 5, 2002.

Before BOGGS, and GUY, Circuit Judges; and CARR, District Judge.*

## OPINION

CARR, District Judge.

Defendants Arnold Redd and Bernard Shackleford, former Detroit police officers, appeal their convictions, and Shackleford appeals his sentence, in this case involving civil rights violations. Shackleford argues that the district court committed prejudicial error by denying his pre-trial motion for severance, and that the court committed legal error in sentencing him based on a total combined offense level of 24. Redd argues that he should be granted a new trial due to the publication, during jury deliberation, of an "inherently" prejudicial newspaper article, and because insufficient evidence was presented to sustain the verdicts.

## BACKGROUND

According to a third superseding indictment, the defendants and several of their fellow police officers engaged in a criminal conspiracy to "injure, oppress, threaten and intimidate persons in the State of Michigan in the free exercise and enjoyment of the rights secured to them by the Constitution and laws of the United States" in violation of 18 U.S.C. § 241.[1]

The indictment charged that the officers, while on duty and without legal justification, would raid crack houses or other locations where they believed drug trafficking was occurring. During these raids, the officers would intimidate those persons found in the houses through threats of violence and the use of firearms. The officers would conduct illegal searches of the locations and persons, including body cavity searches, and keep some or all of the money, drugs, and guns found during

---

* The Honorable James G. Carr, District Judge, United States District Court for the Northern District of Ohio, sitting by designation.

1. 18 U.S.C. § 241 provides:
 If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
 If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—
 They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnaping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

these raids. The officers also stopped and searched cars without legal justification, keeping for themselves any money found during these searches. To conceal their illegal activity, the officers would falsify police reports.

At trial, the government presented evidence of Shackleford's and Redd's involvement in the conspiracy. For example, there was testimony that on August 8, 1995, Redd and a fellow officer entered a room at the Saxony Motel without the consent of the occupants or a warrant. With their guns drawn, they made the occupants lie on the floor and conducted a search of the room and its occupants. Redd and his fellow officer seized drugs and money found in the room. Redd then falsified his police report, changing the circumstances surrounding the search and the amounts of drugs and money confiscated.

The government presented evidence that on August 17, 1995, Redd, Shackleford, and fellow officers entered a house without consent or a warrant. The officers made an extensive search of the house, took property from the occupants, and then failed to detail the search in their police reports.

On September 13, 1995, Shackleford and a fellow officer responded to a complaint of breaking and entering. This call resulted in the arrest and search of a suspect. The search recovered a firearm, $500 cash, and other personal property. Shackleford's report following this incident failed to mention the firearm and reported the seizure of only $120 cash. Additionally, the report falsely stated that crack cocaine was found on the suspect.

In September of 1995, Redd and a fellow officer approached an individual standing across the street from the Saxony Motel. The two officers physically assaulted the individual and confiscated $260 cash from him. In December of 1996, Redd and the same fellow officer confronted the same individual. During this confrontation, the officers confiscated a pistol, which neither officer ever reported having seized.

On November 11, 1995, Redd, Shackleford, and fellow officers entered a home in Detroit without consent or a warrant. The officers searched the home and its occupants, seizing drugs and money. The officers kept money and drugs, falsifying their reports following this incident.

On January 28, 1996, Redd and a fellow officer entered a Detroit home and discovered a firearm. The officers kept the firearm and failed to note its existence in the report filed following the incident.

On February 12, 1996, Redd and fellow officers entered a home without consent or a warrant. The officers took money from the occupants of the home, but failed to report the actual amounts taken. Additionally, the officers falsely arrested one of the occupants of the home.

On May 6, 1996, Shackleford and a fellow officer entered a suspected crack house and conducted a search. The search uncovered a firearm that the officers took but failed to report. Three days later, Shackleford, Redd and fellow officers returned to the same house. The officers searched the house and detained the occupants. Redd took approximately $800 cash from one of the occupants. Redd failed to report this money following the incident.

In addition to the conspiracy count, the indictment charged, in Count Fifteen, that defendant Redd "did knowingly possess a stolen firearm," which had traveled in interstate commerce, in violation of 18

U.S.C. §§ 922(j)[2] and 924(a)(2).

A jury found both defendants guilty of conspiracy to violate civil rights under 18 U.S.C. § 241, and found Redd guilty of possession of a stolen firearm under 18 U.S.C. § 922(j). The district judge sentenced Shackleford to a sentence of fifty-one months and Redd to concurrent sentences of one hundred and twenty months on each count.

## DISCUSSION

On this appeal, Shackleford argues that the district court erred by denying his pre-trial motion for severance, and sentencing him based on a total combined offense level of 24. Redd argues that he was prejudiced by the publication, during jury deliberations, of an "inherently" prejudicial newspaper article, and that the government presented insufficient evidence to sustain his guilty verdict. We review Shackleford's appeals first.

### I. Denial of Motion to Sever

Shackleford argues that the trial court committed prejudicial error by denying his pre-trial motion for severance. He claims that the crimes alleged against his co-defendants,[3] such as selling crack cocaine, possessing stolen firearms, and lying to the grand jury, are dissimilar from the crime of conspiracy he was charged with

committing. Shackleford argues that, by failing to sever, the trial court caused the evidence relating to the substantive crimes of his co-defendants to "spill over"—i.e., affect the jury's consideration of the evidence against him.

■ We review Shackleford's appeal in light of the "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* (quoting *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). Thus, "[p]ersons jointly indicted should, as a general rule, be tried together, for 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" *United States v. Anderson,* 89 F.3d 1306, 1312 (6th Cir. 1996) (quoting *United States v. Phibbs,* 999 F.2d 1053, 1067 (6th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994)).

■ Additionally, because Shackleford failed to renew his pre-trial motion for severance at the close of evidence, we can reverse only on a showing of "plain error"

---

**2.** 18 U.S.C. § 922(j) states:

> It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**3.** Shackleford refers to the following substantive crimes of which he was not charged: 1) Counts Three, Five, Seven, and Nine—violation of 18 U.S.C. § 924(c)(1), use and carrying of a firearm during a crime of violence; 2) Count Eleven—violation of 21 U.S.C. §§ 841(a)(1) & 846, conspiracy to distribute cocaine base; 3) Count Thirteen—violation of 18 U.S.C. § 844, possession of cocaine; 4) Counts Fourteen and Fifteen—violation of 18 U.S.C. § 922(j), possession of a stolen firearm; and 5) Count Sixteen—violation of 18 U.S.C. § 1623(a), false declarations before a grand jury.

by the district court.[4] *Id.* ("[Where] the defendant does not renew his severance motion at the close of evidence, we can reverse only upon a showing of plain error.") (citing *United States v. Patrick,* 965 F.2d 1390, 1400 (6th Cir.1992)); FED. R. CRIM. P. 52(b). "A 'plain error' is an error that is clear or obvious, and if it affects substantial rights, it may be noticed by an appellate court." *United States v. Barajas–Nunez,* 91 F.3d 826, 830 (6th Cir.1996) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). We have the authority to correct a forfeited error that is "plain" and "affects a substantial right," but we are not required to do so. *Olano,* 507 U.S. at 735. "Generally, the courts of appeals should exercise their discretion to correct a plain forfeited error that affects substantial rights only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Barajas–Nunez,* 91 F.3d at 830 (quoting *Olano,* 507 U.S. at 736).

Prior to trial, Shackleford moved for severance pursuant to both Fed.R.Crim.P. 8(b) and 14. The district court denied this motion. On appeal, Shackelford asserts that the initial joinder was improper under Rule 8, and that he suffered prejudice by the denial of his motion to sever under Rule 14. Because Rule 8(b) and Rule 14 are "analytically and procedurally dis-

tinct," we review the district court's denial under each rule separately. *United States v. Lloyd,* 10 F.3d 1197, 1214 (6th Cir.1993); *United States v. Williams,* 711 F.2d 748, 750 (6th Cir.1983).

### A. Misjoinder Under Rule 8(b)

■ Joinder of multiple defendants is proper under Rule 8(b) only if each of the counts in the indictment arises out of the same act or transaction, or group of acts or transactions that are logically interrelated. *See Lloyd,* 10 F.3d at 1214–15; *United States v. Johnson,* 763 F.2d 773, 777 (6th Cir.1985); *United States v. Hatcher,* 680 F.2d 438, 441 (6th Cir.1982).

Shackleford argues that the indictment on its face alleges no "connection in time or intent between the conspiracy against rights alleged against [him], and the possession of illegal weapons, sale of 'crack' cocaine, or lying to the grand jury of [his] co-defendants." (Final Br. of Appellant Shackleford at 12).

■ We disagree. Most of the substantive counts against Shackleford's co-defendants were identical to certain overt acts of the conspiracy that were charged against Shackleford.[5] These were substantive crimes committed within several months of each other and in furtherance of the conspiracy of which Shackleford was a

---

4. Generally, "this court reviews a district court's decision to join cases under [Rule] 8(b) for harmless error, and joinder should be upheld unless it results in 'actual prejudice' because it had a 'substantial and injurious effect or influence' on the jury's verdict." *United States v. Lloyd,* 10 F.3d 1197, 1214 (6th Cir.1993) (quoting *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986)). Denial of severance under Rule 14 "is addressed to the discretion of the trial judge, and a denial of severance is reviewable to determine if there was an abuse of discretion." *Id.* at 1215 (citing *United States v.*

*Williams,* 711 F.2d 748, 750 (6th Cir.1983)); *see also Lane,* 474 U.S. at 449 n. 12.

5. Counts Two and Three correspond to overt act thirty-five. Counts Four and Five correspond to overt act forty-one. Counts Six and Seven correspond to overt act forty-three. Counts Eight and Nine correspond to overt act forty-four. Count Eleven corresponds to overt act fifteen. Count Fourteen corresponds to overt act seventeen. Count Fifteen, possession of a stolen firearm, corresponds to overt acts twenty-nine and forty-four, as it was alleged that co-defendant Redd took the firearm during the conspiracy.

part.[6] Thus, the charges against Shackleford and his co-defendants represent a group of acts that logically are interrelated. Accordingly, we hold that the district court did not commit plain error by denying Shackleford's motion to sever under Rule 8(b).

## B. Prejudicial Joinder Under Rule 14

■■■ Rule 14 provides that severance may be granted if substantial prejudice would result to an individual defendant tried jointly with another. *United States v. Licavoli*, 725 F.2d 1040, 1051 (6th Cir. 1984). The rule is pertinent only if joinder initially was proper under Rule 8 but a joint trial would prejudice one or more defendants. *Lloyd*, 10 F.3d at 1215. Courts place a heavy burden on defendants seeking severance, requiring a strong showing of prejudice. *Licavoli*, 725 F.2d at 1051 (citing *Opper v. United States*, 348 U.S. 84, 94, 75 S.Ct. 158, 99 L.Ed. 101 (1954)).

■■■ Here, Shackleford argues that proof against him was "sandwiched around the lurid testimony" about his co-defendants committing other crimes including possession of stolen firearms, selling crack cocaine, and lying to the grand jury. Shackleford argues that this caused a "prejudicial spillover" of testimony against him.

■■■ Shackleford, however, has failed to show that any prejudicial spillover actu-

ally occurred, and "absent a showing of substantial prejudice, spillover of evidence from one case to another does not require severance." *Johnson*, 763 F.2d at 777. Thus, even if we found that any prejudicial spillover actually occurred, Shackleford would still need to prove that such a spillover caused him substantial prejudice. He has failed to do this.

In an attempt to demonstrate substantial prejudice, the only fact that Shackleford cites is the length of the jury deliberation—nearly a month. This alone, however, is not convincing evidence that Shackleford was prejudiced substantially by the evidence presented against his co-defendants. A lengthy jury deliberation, without more, presents no indication that Shackleford was prejudiced substantially.[7] Accordingly, we hold that the district court did not commit plain error in denying Shackleford's motion for severance under Rule 14.

## II. Offense Enhancement

Shackleford also argues that the district court erred at sentencing by increasing his offense level by three levels based on a finding of obstruction of justice. His argument is two-part. First, Shackleford argues that no conviction for obstruction of justice could be justified under either Michigan or federal law. Second, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120

---

6. Count Sixteen, charging Julius Tate with lying to a grand jury, is the only count that does not directly correspond with an overt act of the conspiracy. We, however, need not consider this count, as Tate was tried separately from Shackleford.

7. The district court also gave the jury this limiting instruction:

 The defendants have all been charged with one crime in Count One, but in our system of justice, guilt or innocence is personal and individual. It is your duty to separate-

ly consider the evidence against each defendant, and to return a separate verdict for each one of them. For each defendant, you must decide whether the government has presented evidence proving that a particular defendant is guilty beyond a reasonable doubt. Your decision on one defendant, whether it is guilty or not guilty, should not influence your decision on any of the other defendants.

(App. at 3156–57).

S.Ct. 2348, 147 L.Ed.2d 435 (2000), Shackleford argues his due process and jury trial rights were violated because a jury did not making a finding beyond a reasonable doubt that he had obstructed justice.

We hold that the district court did not err in sentencing by increasing his offense level by three levels for obstruction of justice. In light of Shackleford's actions, a conviction for obstruction of justice is justified under Michigan common law. Additionally, Shackleford's due process and jury trial rights were not violated because the sentence imposed does not exceed the maximum penalty permitted by the statute of conviction for those facts that were established by the jury verdict.

█ The sentencing guideline for conspiracy to violate civil rights is § 2H1.1.[8] This section contains four alternative base offense levels and directs the court to apply the greatest of the four. The district court applied the first alternative base offense level, which directs the court to apply "the offense level from the offense guideline applicable to any underlying offense." USSG § 2H1.1(a)(1). The application note to § 2H1.1 defines this as "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law."

The district court applied the base offense level for obstruction of justice under § 2J1.2 of the guidelines. This section provides a base offense level of 12, plus an increase by three levels "if the offense

resulted in substantial interference with the administration of justice . . . ." USSG § 2J1.2(b)(2). Thus, the guidelines for obstruction of justice produced an offense level of 15.

Shackleford argues that the application of the base offense level for obstruction of justice, and its three level increase, was improper because there is no common law crime of obstruction of justice under Michigan law. Shackleford relies on the Michigan Supreme Court decision in *People v. Thomas*, 438 Mich. 448, 475 N.W.2d 288 (1991), to support his argument.

*Thomas* centered on the falsification of a police incident report. The defendant police officer arrested a suspected drug dealer in a parking lot. On preparing a report of the arrest, the defendant officer falsely stated that he received a tip that an individual fitting the suspect's description would be in the parking lot and in possession of drugs and a gun. This report, including the false statement, was forwarded to the prosecutor for the purpose of obtaining a warrant for the suspect's arrest. The chief of police detected the false statement and the defendant officer was charged with several crimes, including obstruction of justice under M.C.L. § 750.505. Under M.C.L. § 750.505, "Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony . . . ."

---

8. Section 2H1.1 states:
 (a) Base Offense Level (Apply the Greatest):
 (1) the offense level from the offense guideline applicable to any underlying offense;
 (2) 12, if the offense involved two or more participants;
 (3) 10, if the offense involved (A) the use or threat of force against a person; or (B) property damage or the threat of property damage; or

 (4) 6, otherwise.
 (b) Specific Offense Characteristics
 (1) If (A) the defendant was a public official at the time of the offense; or (B) the offense was committed under color of law, increase by 6 levels.
 USSG § 2H1.1.

In discussing whether the defendant officer violated M.C.L. § 750.505, the court first determined that Michigan did not have a statute that would preclude the charge of common law obstruction of justice. *Thomas,* 438 Mich. at 455, 475 N.W.2d 288. The court then analyzed the common law offense of obstruction of justice to determine if a charge could have been made on the facts of the case. The court determined that, at common law, obstruction of justice was not a single offense but a category of offenses that interfered with public justice. *Id.* at 457, 475 N.W.2d 288. The court reviewed the twenty-two offenses listed by Blackstone under the category of "Offences against Public Justice" to see if any category applied to the defendant officer's actions. *Id.* at 457–58 n. 5, 475 N.W.2d 288.

The court found that, of the twenty-two listed offenses, the offenses of "barratry" and "conspiracy to indict an innocent man" were closest to the facts of the case. The court, however, found that the facts in the case fit neither offense. *Id* at 458, 475 N.W.2d 288. The court reasoned that common law "barratry," an offense committed when an individual filed meritless suits against others, required the filing of more than one suit. *Id.* Because the defendant had filed only one false report, the court determined that the facts of the case did not satisfy the elements of the barratry offense. Because there was no conspiracy, the court also determined that the facts of the case did not satisfy the elements of "conspiracy to indict an innocent man." *Id.*

The facts in Shackleford's case, however, are distinguishable from the facts in *Thomas.* Here, Shackleford's actions satisfy the definitions of the common law offenses of both barratry and conspiracy to

indict an innocent man. Unlike the defendant officer in *Thomas,* Shackleford falsified three separate arrest reports. Moreover, the jury found that he was involved in a conspiracy to violate civil rights. Thus, under the Michigan Supreme Court's reading of the common law, Shackleford's actions amounted to common law obstruction of justice. Accordingly, we find that the district court's application of the base offense level for obstruction of justice to Shackleford's sentencing was appropriate.[9]

█ Shackleford also argues that the three-level enhancement, as a result of applying the obstruction of justice guidelines, violated his due process and jury trial rights because there was no jury determination beyond a reasonable doubt that he obstructed justice. In support of his argument, Shackleford relies on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which states:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule ... "It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

*Apprendi,* 530 U.S. at 490 (quoting *Jones v. United States,* 526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (Stevens, J., concurring)) (citing *Jones,* 526 U.S. at 253 (Scalia, J., concurring)).

---

9. In light of this holding, this court finds no reason to address Shackleford's argument that his actions do not constitute obstruction of justice under federal law.

According to Shackleford, the principles that apply in *Apprendi* logically extend to the determination of certain facts that enhance sentences under the sentencing guidelines.[10] This court, however, has held that when a sentencing court determines the existence of an underlying offense not specified in a jury verdict, *Apprendi* is not triggered when the resulting penalty is not beyond the prescribed statutory maximum for the crime specified in the jury's verdict. *United States v. Munoz*, 233 F.3d 410, 414 (6th Cir.2000); *see also United States v. Strayhorn*, 250 F.3d 462, 470 (6th Cir.2001); *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir.2000). In this case, therefore, *Apprendi* does not apply to Shackleford's sentencing enhancements for obstruction of justice if his sentence remains within the statutory maximum for conspiracy against rights—the offense specified in his jury verdict.

The maximum statutory penalty for conspiracy against rights is ten years imprisonment. 18 U.S.C. § 241. The district court sentenced Shackleford to imprisonment for a term of fifty-one months. (App. at 168). Because the district court's finding of obstruction of justice did not increase Shackleford's penalty beyond ten years imprisonment, *Apprendi* is not triggered. Accordingly, we hold that the district court did not violate Shackleford's due process or jury rights.

### III. Newspaper Article

 Jury deliberations began in this case on October 16, 1998. On November 6, 1998, before the jury concluded its deliberation, an article concerning the case, entitled "Jury Still Out in Corrupt Cop Case," appeared in the Detroit News. According to Redd, this article contained "highly prejudicial statements," including references to "corrupt cops" and the plea convictions of several of the co-conspirators.[11] Redd argues that when the district judge inquired about the jury's exposure to the article, the judge erred by conducting open-court, mass questioning of the jury, rather than in-chambers, individual questioning. Redd contends that, as a result of the prejudicial nature of the article and the manner in which the jury was questioned, his right to a fair trial and impartial jury was violated.

---

10. The only support Shackleford had for this contention was found in *United States v. Fields*, 242 F.3d 393 (D.C.Cir.2001). Since the filing of Shackleford's brief, the D.C. Circuit amended this opinion on rehearing. *See United States v. Fields*, 251 F.3d 1041 (D.C.Cir.2001). In its amended opinion, the court stated:

> *Fields I* goes awry in suggesting that *Apprendi* also applies to a Sentencing Guidelines enhancement that results in a sentence *within* the statutory range .... As this court recently has held, *Apprendi* does not apply to sentencing findings that elevate a defendant's sentence *within* the applicable statutory limits .... In other words, *Apprendi* does not apply to enhancements under the Sentencing Guidelines when the resulting sentence remains within the statutory maximum.

*Id.* at 1043–44 (emphasis in the original).

11. It should be noted that Redd failed to include in the joint appendix a copy of the article and a transcript of the district court proceedings relating to this issue. The appellant has the duty to prepare and file the appendix, and this court has dismissed appeals for failing to satisfy this obligation. *See United States v. Green*, 547 F.2d 333, 334 (6th Cir.1976); *United States v. Kush*, 579 F.2d 394, 396 (6th Cir.1978); FED. R. APP. P. 30. For purposes of this appeal, however, the content of the article is immaterial. It is enough that it is undisputed that the response of the jury relating to the article was satisfactory and the defense counsel did not object to the manner in which the trial judge questioned the jury. The government has recited verbatim excerpts from the trial transcript and Redd does not dispute the accuracy of these excerpts.

After counsel brought the article to the district court's attention, the district judge held a meeting with counsel for each party to discuss the situation. During this discussion, counsel for one of the defendants asked the court to devise a way of determining whether any of the jurors had seen the article without "drawing attention to it." Counsel for the co-defendants suggested that the court make a general inquiry to the jury—"not whether they've seen the article in particular, but whether they've seen any media coverage." Although other defense counsel suggested sequestering the jury or taking partial verdicts to avoid damage from any future publicity, no one suggested that the court handle the inquiry about possible exposure to the article any differently. As a result of the discussion with counsel, the district judge announced that she would "question [the jurors] in general terms, as we discussed earlier, about the publicity that was in the paper last night and apparently also on the radio, and advise them to continue avoiding any news reports in the terms that we discussed earlier." Defense counsel did not object to this approach.

After meeting with counsel, the judge brought in the jury and asked "if there is anyone who has inadvertently come across any news articles or news reports concerning this case in the last day or so." The jurors responded that they had not. Satisfied with the jury's response and convinced that no juror had been exposed to the publicity, the judge gave the jury the following instructions:

All right. I would like to caution you that it's extremely important at this point that you do whatever, take whatever precautions you can to avoid inadvertently hearing, seeing, or reading something that may touch upon this case, and I'm not suggesting that anyone has not

taken precautions, but only that you need to really be vigilant about it. You need to not let anyone raise any issue with respect to the case with you, and I think it would be advisable if until you are able to return verdicts in this case, if you would avoid watching any television, news shows, listening to any radio news, and reading from any local news sections of the papers, just on the chance that you may inadvertently come across something touching on the case.

Obviously, the reason that this is so important is that you are the finders of fact in this case, you are the only ones who heard all the evidence, you are the only ones who have had opportunity to discuss and deliberate on this and review the evidence, the exhibits, the testimony, and it would not be right that anyone outside of the jury have input. Obviously, people have different perspectives, different from yours, different from mine, different from anyone who may have been in and out of the courtroom. This is your case. This is—you are the finders of fact, and we don't want any outside influence to bear upon your decision.

No defendant objected to the judge's question or instructions, and no defendant suggested any further inquiry.

Despite the fact that there is no indication that any juror saw the article, Redd argues on appeal that the publication of the article resulted in a biased jury. Because defense counsel failed to object at trial, we can reverse only if there is plain error affecting substantial rights. *United States v. Maxwell*, 160 F.3d 1071, 1076 (6th Cir.1998); FED. R. CRIM. P. 52(b). Redd argues that the newspaper article was "inherently prejudicial," and that this court should presume that the jury was preju-

diced by its publication.[12] Redd's argument, however, puts the cart before the horse. The prejudicial nature of the article is immaterial if the jury was never exposed to the article in the first place. If the jury was never exposed to the article, there is no way that it could have been prejudiced, even if this court deemed the article inherently prejudicial. Therefore, we must first determine whether the jury actually was exposed to the article.

The district judge, after consulting with the parties' counsel, took steps to ascertain whether the jurors had been exposed to the article. The jurors indicated that they had not been exposed. Both the judge and defense counsel were satisfied with the jurors' response and the manner in which the jurors were questioned.

Redd argues that the manner in which the district judge ascertained whether any jurors had read the article was inadequate. Redd contends that the district court should have questioned each juror individually rather than en banc in open court. Redd claims that it is more probable that a juror would deny having read the article in the face of open-court questioning than in individual, in-chambers questioning. In other words, Redd argues that some of the jurors probably lied about reading the article. This argument, however, is pure speculation. Redd presents no evidence that would indicate that any juror had

been exposed to the article, much less lied to the court about such exposure.[13] In light of this lack of proof, we hold that the district judge did not commit plain error through the manner in which she questioned the jury regarding the newspaper article.

## IV. Sufficiency of the Evidence

Redd also argues that the district court erred by denying his motion for a new trial once it was learned that one of the government's witnesses committed perjury while testifying.

Pursuant to Fed.R.Crim.P. 33, Redd filed a motion for a new trial with the district court. Although an appeal was pending at the time Redd moved for a new trial, the district court had jurisdiction "to entertain the motion and either deny the motion on its merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case." *United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *United States v. Warner,* 10 F.3d 1236, 1239 (6th Cir. 1993). Here, the district court denied Redd's new trial motion.

■■■■ A denial of a Rule 33 motion is an appealable order, and "an immediate appeal taken from the denial will be consolidated with a pending appeal taken from

---

**12.** Redd cites two cases in particular to support his claim that the article at issue was inherently prejudicial. *See Goins v. McKeen,* 605 F.2d 947 (6th Cir.1979); *United States v. Williams,* 568 F.2d 464 (5th Cir.1978). In *Goins,* this court stated, "where the circumstances attending a conviction are inherently prejudicial, a reviewing court will presume a violation of the defendant's constitutional rights." These cases, however, are distinguishable. In each of the cases cited by Redd, there was evidence before the trial court that some of the jurors actually had been exposed to the prejudicial publicity.

Here, there was no indication that any of the jurors had been exposed to the newspaper article.

**13.** Redd also presents no evidence that individual questioning of the jurors would have been a better approach in this case. In fact, the record seems to indicate the opposite—that individual questioning of the jurors may have done more harm than good. This is reflected in defense counsel's suggestion that the court address the article without "drawing attention to it."

the judgment of conviction." *United States v. Hatfield,* 815 F.2d 1068, 1073 (6th Cir.1987). Such an appeal, however, is still "subject to the requirement that the appeal be taken within ten days from the docketing of the district court's order." *Id.;* FED. R. APP. P. 4(b). Because Redd failed to file a notice of appeal within ten days from the docketing of the district court's order denying his Rule 33 motion, this court lacks jurisdiction to entertain his appeal from that order. *See United States v. Means,* 133 F.3d 444, 448 (6th Cir.1998); *Warner,* 10 F.3d at 1240; *Hatfield,* 815 F.2d at 1074.

 Redd also argues that the government failed to present sufficient evidence to sustain his conviction under the possession of stolen weapons and conspiracy counts. We review claims of insufficient evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). "Moreover, circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *United States v. Stone,* 748 F.2d 361, 363 (6th Cir.1984)). We must make all reasonable inferences in favor of the government. *United States v. Layne,* 192 F.3d 556, 567 (6th Cir.1999).

### A. Possession of Stolen Firearm

Redd argues that the government failed to prove two of the essential elements under 922(j), namely, that Redd possessed the firearm and that the firearm had traveled in interstate commerce after it was stolen. We reject both arguments.

 In challenging the possession element, Redd argues that the government presented absolutely no evidence that he "exercised authority, dominion, or control over the firearm." This argument is not well-taken. The government presented evidence that the firearm was discovered in the attic of Redd's home,[14] and that a magazine fitting the firearm was recovered from his closet. A reasonable juror could infer from this evidence that Redd hid the firearm in his attic and its magazine in his closet. Additionally, the government presented evidence that on numerous occasions, Redd and other officers took, and kept for themselves, several firearms during illegal searches and seizures. While there was no direct evidence that Redd took the particular firearm found in his home during an illegal search, a rational juror could infer that Redd had unregistered and illegally obtained firearms in his possession. Thus, based on the evidence presented at trial, we find that a reasonable jury could find that Redd possessed the stolen firearm found in his home.

 In challenging the interstate commerce element of § 922(j), Redd argues that the government was required to prove

14. Under 18 U.S.C. § 922(g)(1), the government may prove possession by "proving constructive possession, which exists 'when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *United States v. Layne,* 192 F.3d 556, 572 (6th Cir.1999) (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.1973)). "[T]he government can prove a defendant's control over firearms by showing that he has dominion over the premises in which the firearms are located." *Id.* (citing *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir.1998)). Here, Redd does not dispute that he had control over the attic of his home.

a continuing relationship with interstate commerce at the time Redd concealed the firearm and that the firearm crossed state lines after it was stolen. Redd relies, however, on cases decided prior to the 1991 and 1994 amendments to § 922(j).

The current version of § 922(j) states:

It shall be unlawful for any person to receive, possess, conceal, store ... any stolen firearm or stolen ammunition, ... which is moving as, which is a part of, which constitutes, or *which has been shipped or transported in,* interstate or foreign commerce, *either before or after it was stolen,* knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

(emphasis added).

Here, the government presented sufficient evidence to satisfy the interstate commerce element of § 922(j). There was undisputed evidence that the firearm was manufactured outside of Michigan, and that the firearm had been stolen from a Detroit business in 1991. Thus, the government's evidence satisfied the interstate commerce element of § 922(j) by establishing that the firearm found in Redd's home had traveled in interstate commerce and had been stolen. Contrary to Redd's contention, the government need not show that the firearm was stolen prior to its transport in interstate commerce. *See United States v. Honaker,* 5 F.3d 160, 162 (6th Cir.1993). Accordingly, we hold that the government presented sufficient evidence to support Redd's conviction under § 922(j) for possession of a stolen firearm.

**B. Conspiracy Count**

 Redd also argues that the government failed to prove the conspiracy count under Count One of the third superseding indictment. Redd argues that the government failed to present any "direct evidence" of a criminal agreement among the officers. This court, however, has held that "the government need not prove a formal agreement to establish the existence of a conspiracy to violate federal law and that a tacit or mutual understanding among the parties will suffice." *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989). "Moreover, '[a] conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Id.* (quoting *United States v. Bavers,* 787 F.2d 1022, 1026 (6th Cir.1985)).

The government presented more than enough evidence for a rational trier of fact to infer that Redd participated in a common plan with his fellow officers. The evidence established that the officers, usually acting in groups of three to six officers, would engage in similar types of civil rights violations and then discuss how they were to file their reports of each incident. Additionally, this evidence established that Redd possessed the requisite criminal mens rea, and we are convinced that a reasonable juror could conclude that Redd knew his actions were illegal.

 Redd also argues that this court should disregard the testimony of the government's witnesses because "the testimony was patently unreliable 'evidence' from witnesses who carried the motivation to lie and lash out at the very officers who sought to control and curb their criminal enterprises." (Final Br. of Appellant Redd at 33). Redd, however, is asking this court to second guess the credibility determinations made by the jury. In reviewing a sufficiency of the evidence argument this court will refrain from "independently judging the credibility of witnesses." *United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996). Accordingly, we hold that the government presented sufficient evidence of

Redd's involvement in a conspiracy with fellow officers to deny civil rights.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the convictions of Bernard Shackleford and Arnold Redd, and the sentencing of Shackleford.